**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
Ryan B. Martin (State Bar No. 359876)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          jwilner@bursor.com
          jglatt@bursor.com
          rmartin@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY BEAL and COURTNEY WHETSTONE, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>    vs.<br><br>MW POLAR FOODS CORPORATION,<br><br>                  Defendant. | Case No. **'25CV1358 WQHJLB**<br><br>**CLASS ACTION COMPLAINT** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiffs Beverly Beal and Courtney Whetstone ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against MW Polar Foods Corporation ("Defendant"). Plaintiffs make the following allegations pursuant to the investigations of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated who purchased Defendant's canned Salmon Fillet in Brine and Juice (the "Product").[1]

2. The flesh of farm-raised salmon is naturally grey or white. So, to make it a more appealing pink, salmon farmers add color additives to the farmed salmon's feed. The additives used are one of two chemicals: astaxanthin or canthaxanthin. As such, "[t]o prevent economic fraud in salmonid fish containing added astaxanthin, the [FDA] requires declaration of the presence of the color additive" on the product packaging. 63 Fed. Reg. 18738 (1998).

3. Defendant's Product is farm-raised in net-pens in Norway and Chile. As such, the only way that the fish in Defendant's Product get their signature salmon pink is from color additives Defendant intentionally added to the salmon's feed.

4. Indeed, Independent testing conducted by Plaintiffs' counsel confirmed the presence of astaxanthin in the Product. Because the Product contains a color additive, Defendant was required to disclose it on the label but failed to do so.

5. Plaintiffs sustained injuries by purchasing Defendant's Product which was deceptively marketed as containing salmon fillets with a healthy, natural pink coloring when, instead, Defendant's farm-raised salmon necessarily contained

---

[1] Discovery may reveal that additional products are within the scope of this Complaint. Accordingly, Plaintiffs reserve the right to include additional items identified through the course of discovery.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*artificial* coloring.  The Product is advertised, sold, and distributed by Defendant or its agents, to consumers, including Plaintiffs and Members of the Classes, throughout the United States.

6.    Accordingly, Plaintiffs bring claims against Defendant individually and on behalf of classes of all others similarly situated for (1) violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.;* (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.;* (4) violation of New York Gen. Bus. Law § 349; (5) violation of New York Gen. Bus. Law § 350; (6) breach of express warranty; and (7) unjust enrichment.

## PARTIES

7.    Plaintiff Beverly Beal is a citizen of California who resides in Escondido, California.  Plaintiff Beal most recently purchased the Product in or around January 2024 from a Walmart store in San Marcos, California.  Prior to her purchase, Plaintiff Beal reviewed the Product packaging and relied on Defendant's representations, labeling, and packing and understood that the Product was warranted as being a salmon product that contained a naturally occurring healthy coloring with no artificial coloring added, indicative of wild caught salmon.  As such, those representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product on the same terms had she known those representations were not true.  In making her purchase, Plaintiff Beal paid a price premium due to the false and misleading representation that the Product contains naturally colored salmon filet free of artificial dyes and coloring.  Accordingly, Plaintiff Beal relied on these representations and warranties in deciding to purchase the Product.  Had Plaintiff Beal known that the Product contained artificial coloring she would not have purchased the Product or would have purchased it under substantially different terms.  Plaintiff Beal did not receive the benefit of her bargain because the Product was not, in fact, free of artificial coloring.

2

8.     Plaintiff Beal remains interested in purchasing the Product from Defendant.  However, she is unable to determine if the Product is actually free of artificial coloring.  She understands that the composition of the Product may change over time, but as long as Defendant continues to represent the Product as being free of artificial coloring, when it is not, she will be unable to make informed decisions about whether to purchase the Product and will be unable to evaluate the different prices between Defendant's Product and competitors' products.  Plaintiff Beal is further likely to be repeatedly misled by Defendant, unless and until Defendant is compelled to ensure that the Product's marketing as being free of artificial coloring, is, in fact, true.

9.     Plaintiff Courtney Whetstone is a citizen of New York who resides in Buffalo, New York.  Plaintiff Whetstone has purchased the Product multiple times for the past three years, the most recent being in March of 2025 from a Walmart in Buffalo, New York.  Prior to her purchase, Plaintiff Whetstone reviewed the Product packaging and relied on Defendant's representations, labeling, and packing and understood that the Product was warranted as being a salmon product that contained a naturally occurring healthy coloring with no artificial coloring added, indicative of wild caught salmon.   As such, those representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product on the same terms had she known those representations were not true.  As such, those representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product on the same terms had she known those representations were not true.  Accordingly, Plaintiff Whetstone relied on these representations and warranties in deciding to purchase the Product.  In making her purchase, Plaintiff Whetstone paid a price premium due to the false and misleading claim that the Product is free of artificial dyes and coloring.  Had Plaintiff Whetstone known that the Product contained artificial coloring she would not have purchased the Product or would have purchased it under substantially different terms.  Plaintiff

3

Whetstone did not receive the benefit of her bargain because the Product was not, in fact, free of artificial coloring.

10.    Plaintiff Whetstone remains interested in purchasing the Product from Defendant.  However, she is unable to determine if the Product is actually free of artificial coloring.  She understands that the composition of the Product may change over time, but as long as Defendant continues to represent the Product as being free of artificial coloring, when it is not, she will be unable to make informed decisions about whether to purchase the Product and will be unable to evaluate the different prices between Defendant's Product and competitors' products.  Plaintiff Whetstone is further likely to be repeatedly misled by Defendant, unless and until Defendant is compelled to ensure that the Product's marketing as being free of artificial coloring, is, in fact, true.

11.    Defendant MW Polar Corporation is a Canadian corporation with its principal place of business in Norwalk, California.  Defendant markets, sells, and distributes the Product throughout the United States, including in California and New York.  Defendant manufactured, marketed, and sold the Product at issue at all times during the relevant Class Period.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because there are more than 100 Members of the Classes, the aggregate claims of all members of the proposed Classes exceed $5,000,000.00, exclusive of interest and costs, and at least one Member of the Classes is a citizen of a state different from Defendant.

13.    This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in California. Further, Defendant conducts substantial business within California, including this District, and purposefully avails itself to the benefits of this District by selling its Product in this District.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Additionally, a substantial portion of the events giving rise to Plaintiff Beal's claims occurred in this District.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this District and Plaintiff Beal resides in this District.

## FACTUAL ALLEGATIONS

### A.    The Rise of Farm Raised Salmon

15.    The farmed salmon industry is estimated to be worth $20-billion a year.[2]  "In 2022, more fish were farmed than were captured from the ocean."[3]

16.    Salmon–being high in omega-3 fatty acids, DHA, and EPA[4]–is one of the healthiest foods to consume and the second most popular seafood item in the United States.[5]

17.    Salmon is associated with lowering this risk of stroke, heart disease, and high blood pressure.  It is also known to protect against inflammation, obesity, and cognitive decline.[6]  These factors have contributed to a high demand for salmon.

18.    Because salmon consumption has risen in popularity, wild salmon populations on both U.S. coasts have declined.  Human impacts like dams, overfishing, pollution, and climate change, are largely to blame.[7]

---

[2] Douglas Frantz and Catherine Collins, *3 Reasons to Avoid Farmed Salmon*, TIME MAGAZINE (July 21, 2022), https://time.com/6199237/is-farmed-salmon-healthy-sustainable/.

[3] Priscilla Du Preez, *Salmon is Probably Not as Healthy as You Think*, FARM SANCTUARY (Aug. 9, 2024), https://www.farmsanctuary.org/news-stories/salmon-not-healthy/.

[4] *Omega-3 Fatty Acids*, NAT'L INST. OF HEALTH (Dec. 17, 2024), https://ods.od.nih.gov/factsheets/Omega3FattyAcids-HealthProfessional/.

[5] Mahita Gajanan, *How Farmers Turn Their Salmon Pink*, TIME MAGAZINE (June 13, 2017), https://time.com/4790794/farmed-salmon-pink/.

[6] *See* NIH, *supra* note 4.

[7] *What is Hurting Salmon?*, WASHINGTON STATE RECREATION AND CONSERVATION OFFICE, https://rco.wa.gov/salmon-recovery/problem/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

19.     28 different salmonid species call the West Coast home.  Their populations, however, have been listed as threatened or endangered under the Endangered Species Act.[8]  But despite their protected status, most of those species continued to struggle and decline.[9]

20.     On the East Coast, Atlantic salmon is the only native salmon species. Like their West Coast relatives, human activities have decimated the wild Atlantic salmon populations, culminating in the total collapse of Atlantic salmon fisheries[10] by 1948.[11]  Those fisheries never again reopened and today all Atlantic salmon available for purchase in the United States is farmed.[12]

21.     With the wild salmon population shrinking but consumer demand for salmon growing, aquaculture (or fish farming) became popularized in the 1960s.[13]

22.     Aquaculture works through the use of net pens that float a few hundred yards offshore that are anchored in place through the use of heavy cables attached to the sea floor.[14]  Hatchery-born salmon are transferred to these pens at 10 months

---

[8] West Coast Regional Office, *Report Card on Recovery: Reviews Assess 28 Salmon and Steelhead Species Returning to West Coast Rivers*, NAT'L OCEANIC AND ATMOSPHERIC ADMIN. FISHERIES (last updated Dec. 11, 2024), https://www.fisheries.noaa.gov/west-coast/endangered-species-conservation/report-card-recovery-reviews-assess-28-salmon-and#:~:text=Under%20the%20Endangered%20Species%20Act,review%20answers%20questions%20such%20as:.

[9] *Id.*

[10] The term "fishery" refers the areas of bodies of water where certain populations of fish can be caught for commercial or recreational purposes.  (For more information *see*, *What is a Fishery*, MARINE STEWARDSHIP COUNCIL, https://www.msc.org/en-au/what-we-are-doing/our-collective-impact/what-is-a-fishery#:~:text=A%20basic%20definition%20of%20a,species%20of%20fish%20or%20shellfish. .

[11] *Atlantic Salmon*, NAT'L OCEANIC AND ATMOSPHERIC ADMIN. FISHERIES, https://www.fisheries.noaa.gov/species/atlantic-salmon-protected/overview .

[12] *Id.*

[13] *See* Bruce Barcott, *Aquaculture's Troubled Harvest*, MOTHER JONES (November/December 2001), https://www.motherjones.com/politics/2001/11/aquacultures-troubled-harvest/.

[14] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

old,[15] where they are fed pellets made of fish meal, fish oil, vitamins, color additives, and antibiotics.  Each pen can be home to between 15,000 and 50,000 salmon with a single farm operating between eight and ten pens total.



***Figure 1: Norwegian Salmon Farm***

23.    At first, the practice was hailed as a sustainable solution to the increasing demand.[16]  But as time went on, the harms of aquaculture became more and more apparent: farms pushed out the few remaining wild salmon populations,[17] hinder conservation and wild salmon population restoration efforts.

---

[15] *Id.*

[16] *Id.* ("Back when we envisioned the future in utopian terms, aquaculture was an integral part of the dream.  As surely as we would all drive flying cars, wet-suit-clad cultivators would farm the seas and feed the world with their bounty.")

[17] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

24.     Indeed, in "'[e]very place where Atlantic salmon is raised in net-pens, the wild population[s of other salmon species] has declined by as much as 70 percent[.]'"[18]

25.     This is because, in part, farmed salmon are doused with heavy antibiotics and antiparasitics, resulting in the "[f]armed fish contract[ing] antibiotic-resistant strains of furunculosis, a fatal disease that produces ugly skin ulcers; [which then] wild salmon that migrated past their pens also contracted[.]"[19]

26.     Moreover, "[f]armers count on the tide to disperse net pen effluent, but the water often doesn't flush it all away.  A salmon farm of 200,000 fish releases an amount of fecal solids roughly equivalent to a town of 62,000 people."[20]  As such, in areas near salmon farms, "[s]hrimp fishermen began pulling up traps full of farm muck, a gooey black mixture of feces, excess antibiotic-laden fish feed, and decayed salmon carcasses that filtered out of the pens."[21]

27.     This muck also wreaks havoc on natural ecosystems.  Through a process called eutrophication, this muck introduces excess nutrients like nitrogen and phosphorous into the surrounding waters resulting in an algal bloom.  Bacteria feed not only on the muck but on the decaying algae that is inevitably produced in a eutrophic environment.  The bacteria then consume vast amounts of oxygen, turning the sea-bed into an oxygen-depleted "dead zone;" scientifically known as a hypoxic environment, where few organisms can live.

---

[18] Melissa Clark, *The Salmon on Your Plate Has a Troubling Cost.  These Farms Offer Hope*, NEW YORK TIMES (Oct. 16, 2023), https://www.nytimes.com/2023/10/16/dining/farm-raised-salmon-

[19] *Id.*

[20] *Id.*; *see also* Stuart Miller, *How the King of Fish is Being Farmed to Death*, THE OBSERVER (Jan. 6, 2001), https://www.theguardian.com/environment/2001/jan/07/fishing.food#:~:text=It%20is%20estimated%20that%20a,a%20town%20of%2020%2C000%20people.

[21] Barcott, *supra* note 13.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

28.    Moreover, the environment that farm raised salmon are raised in is so bad that millions of farm-raised salmon die before ever reaching maturity.  In 2019 alone 25,770 tons, amounting to over ten million salmon, died in their cages.[22]  "The main causes of [those] deaths are said to have been viral, bacterial and fungal infections, along with algal blooms, and 'treatment losses' from mistakes with chemicals or de-licing machines."[23]

29.    Because of these impacts, environmental groups like The Sierra Club have concluded that "aquaculture poses numerous potential environmental risks, including the spread of diseases and parasites to nearby wild fish populations and impacts on wild forage fish populations."[24]  Therefore, many environmental organizations advise against consuming farm-raised salmon.

30.    "The fish-farming industry has fed us a line about eating farmed salmon to protect wild stock … [but a]ctually the reverse is true.  If you purchase farmed salmon, you're contributing to the risk to the wild fish."[25]

**B.    Consumers Prefer Wild Caught Salmon Over Farm-Raised Salmon**

31.    Unlike wild salmon, "[f]armed salmon serves as an inferior food source, accumulating more toxic chemicals in fatty tissue with fewer healthy nutrient properties[.]"[26]  Research shows that consuming farmed salmon leads to higher

---

[22] Rob Edwards, *Farmed Salmon Deaths From Disease Reach Record High*, THE FERRET (July 13, 2020), https://theferret.scot/farmed-salmon-deaths-disease-reach-record-high/.

[23] *Id.*

[24] *Aquaculture*, THE SIERRA CLUB, https://www.sierraclub.org/grassroots-network/marine-team/aquaculture .

[25] Barcott, *supra* note 13.

[26] *Farmed Salmon Just as Toxic to Human Health as Junk Food*, BEYOND PESTICIDES (June 16, 2022), https://beyondpesticides.org/dailynewsblog/2022/06/farmed-salmon-just-as-toxic-to-human-health-as-junk-food/.

9

instances of metabolic disorders like diabetes and obesity,[27] contrary to the largely understood health benefits of salmon generally.

32.    "Some studies warn that a single meal per month of farmed Atlantic salmon can expose consumers to contaminant levels exceeding standards from the World Health Organization.  The risk is greatest for infants, children, and pregnant women because of the potential harm from contaminants to developing brains."[28]

33.    Accordingly, nutritionists explain that for consumers get the health benefits of salmon—which consumers like Plaintiffs reasonably expect—they need to eat wild rather than farmed salmon.[29]

34.    Moreover, a blind taste test shows that while consumers preferred the taste of farmed salmon over wild salmon, as soon as the consumers were aware that the salmon was farmed, they indicated that they would still choose a wild salmon product over a farmed salmon product.[30]  Accordingly, whether the product is wild caught or farm raised is material to a consumer's purchasing decision.

35.    Indeed, consumer research confirms that color plays a decisive role for consumers evaluating the quality of salmon at point-of-sale.  In fact, color is considered the consumers' primary consideration in purchasing salmon.[31]

36.    Consumers believe that color indicates a salmon's species, age, origin, price, expected flavor/texture, *freshness*, and quality.  Consumers equate redder

---

[27] *Id.*

[28] Frantz and Collins, *supra* note 2.

[29] *Id.*

[30] Helene Christine Reinbach, *We Prefer Farmed Salmon – As Long As We Don't Know What We're Eating*, UNIVERSITY OF COPENHAGEN FACULTY OF SCI. (Nov. 22, 2021), https://science.ku.dk/english/press/news/2021/we-prefer-farmed-salmon--as-long-as-we-dont-know-what-were-eating/.

[31] Gajanan, *supra* note 5 ("If we didn't do it, customers wouldn't buy it … Consumers buy what they're familiar with.  They won't go into the store to buy white salmon.").

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

flesh as a sign of higher quality salmon and are willing to pay more for deeply colored salmon.

37.    Wild Salmon, which is usually a much deeper red than farmed salmon "fares better on the market because the deep red carries cultural significance, a reminder of a time before mass farming when salmon was 'the fish of the rich.'"[32]

38.    Accordingly, salmon farmers admit that if they did not include the color additive in their products, consumers will not purchase the products at all.[33]  Color is so important to consumers that they "will pay up to $1 per pound more for darker colored salmon compared to salmon with lighter hues[.]"[34]

39.    However, once "consumers know that color has been added to farmed salmon, they are less willing to pay for the darkest fish[.]"[35]  For this reason, salmon farmers like Defendant, seek to hide the use of color additives in their Products.

40.    To prevent this fraud, Federal and California law requires that color additives be noted on salmon products to ensure that consumers are *actually* buying what they believe they are buying.

**C.    Defendant Adds Color Additives to the Product**

41.    Defendant manufactures, distributes, advertises, and sells the Product, Salmon Fillet in brine and juice.  The Product is sold online and in brick-and-mortar stores.  The Product is made from Atlantic Salmon, a species of salmon that, as explained above, must be farmed.

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

***Figure 2: Product Image***

42.     Salmon, like flamingos, get their signature pink color from the food they eat.  In the wild, salmon consume carotenoids from microalgae, phytoplankton, and small fish that, in turn, make the salmon pink.[36]

43.     But farm raised salmon—which live on a diet of pellets and antibiotics—do not consume beta carotenes.  Thus, farmed raised salmon flesh is grey or white rather than pink.[37]

44.     Defendant's Product is farm-raised in net-pens in Norway and Chile.  As such, the only way that the fish in Defendant's Product would contain color additives would be if Defendant intentionally added it to the salmon's feed.

45.     Independent testing conducted by Plaintiffs' counsel has confirmed the presence of astaxanthin in the Product.

---

[36] Barcott, *supra* note 13.
[37] Gajanan, *supra* note 5.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

46.     The only reason farm raised salmon would contain astaxanthin is if it was being added to the salmon's feed for the purpose of changing the color of the fishes' flesh.

47.     Because consumers have grown to understand the health benefits of salmon and their preference for brighter pink coloring, fish farmers add pigmentation to the salmon feed.  This coloring is called astaxanthin or canthaxanthin.[38]

48.     Fish farmers use a "SalmoFan"—like an artist's color wheel—that help determine how much astaxanthin or castaxanthin a farmer needs to add to the fish feed to achieve the desired color.



**Figure 3: SalmoFan**

49.     But neither chemical comes without a risk to consumers.  For example, canthaxanthin is banned in the United Kingdom[39] as an additive because it can deposit yellow particles in human retinas and impair vision.[40]

---

[38] *Id.*

[39] *Id.*

[40] Stuart Millar, *How the King of Fish is Being Farmed to Death*, THE OBSERVER (Jan. 6, 2001),

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

50.    Indeed, Canthaxanthin was the more popular color additive until the early 2000s when salmon farmers were encouraged to switch to the more expensive astaxanthin.

51.    Under the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 343, a salmonid product is misbranded when the product packaging fails to inform consumers of the presence of the artificial coloring astaxanthin.  Specifically, the implementing regulations require that "[t]he presence of the color additive in salmonid fish that have been fed feeds containing astaxanthin shall be declared in accordance with §§ 101.22(k)(2) … of this chapter."  21 C.F.R. § 73.35(d)(3).

52.    The labeling requirement may be satisfied with statements on the packaging like "'Artificial Color,' 'Artificial Color Added,' or 'Color Added' (or by an equally informative term that makes clear that a color additive has been used in the food)."  21 C.F.R. § 101.22(k)(2).

53.    Laws enacted by most states, including California, also require this disclosure.  California Health and Safety Code declares that "[a]ny food is misbranded if it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless its labeling states that fact."  Cal. Health & Safety § 110740.  Moreover, for salmon specifically the California Health and Safety Code expressly incorporates the FDA's labeling requirements.  Cal. Health & Safety Code § 110795.  However, as shown above, the front label, which Plaintiffs viewed and relied on when making their purchases, is entirely devoid of these mandated disclosures.

**D.    Defendant Knew or Should Have Known That Consumers Would Be Misled by its Omissions**

54.    Defendant pursued a nationwide policy to violate federal and state regulations by concealing that its Product contained (and continues to contain)

---

https://www.theguardian.com/environment/2001/jan/07/fishing.food#:~:text=It%20is%20estimated%20that%20a,a%20town%20of%2020%2C000%20people.

artificial coloring.

55.    Knowledge of use of artificial coloring, like astaxanthin, is material to consumers' purchasing decisions.

56.    Not all farm-raised salmon is bad.  Recent development in aquaculture has introduced new systems that raise the salmon "in closed-containment facilities on land.  The fish swim in tanks filled with filtered, recirculated water and the salmon never touch the ocean, eliminating the use of chemicals and damage to the environment."[41]

57.    The way consumers usually understand these differences comes down primarily to consumer perception of the color of the salmon.

58.    Astaxanthin is very expensive, accounting for 20% of the cost of the feed for farmed salmon.[42]  But because color is so important to consumers and results in an increase in consumer purchase price salmon farmers find that adding color additives to the feed is worthwhile.[43]

59.    As such, the addition of artificial color to farm-raised salmon increases the marketability of farm-raised salmon and inflates the price of the Product.

60.    However, Defendant did not disclose its use of astaxanthin in its Product.  Therefore, Defendant's concealment of artificial coloring in its salmon misled consumers, including Plaintiffs and Members of the proposed Classes, into

---

[41] Frantz et al., *supra* note **Error! Bookmark not defined.**; *see also* Clark, *supra* note 18 ("Now, several land-based farms across the country are beginning to offer a more climate-stable alternative to traditional salmon aquaculture — one that's cleaner, more ecologically responsible and potentially has a lower carbon footprint.").

[42] *Id.*

[43] Donna Byrne, *Disclosing the Potentially Dangerous Dyes that Make Gray Salmon Pink: The California Supreme Court Holds that Actions to Enforce the State's Food Labeling Law Are Not Preempted By Federal Law*, FINDLAW (Feb. 18, 2008), https://supreme.findlaw.com/legal-commentary/disclosing-the-potentially-dangerous-dyes-that-make-gray-salmon-pink.html.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

believing that the salmon they purchased did not contain color additives and/or was of a higher quality than other farmed salmon products.

61.    By concealing the presence of artificial color in its Product and thereby capitalizing on consumers' understanding of the higher quality, wild caught salmon. Defendant's conduct was uniform across all its salmon Products.

62.    In line with the F.D.A.'s concern and corresponding labeling requirements, "transparency, better regulation, and accurate labels on farmed salmon are essential to ensure good choices for our health[.]"[44]

63.    But unfortunately for consumers, the Product "looks like it came from the same place as its wild relation, with that rich, pink hue. …. Nothing, apart from the bargain-basement price tag, to give away the reality of intensive salmon production, which has turned the King of Fish into the battery chicken of the seas."[45]

64.    Given consumers' undisputed reliance on salmon color in their purchasing decision, their preference for health-benefit-supporting salmon, and their concerns about farmed fish and artificial coloring agents, consumers like Plaintiffs were injured by Defendant's failure to comply with its labeling requirements.

65.    By concealing the artificial coloring of their Product, Defendant has become unjustly enriched because consumers have been (and continue to be) misled into purchasing the Product in that they would not have done so or would have done so on substantially different terms.

66.    Although Defendant is in the best and exclusive position to know the true composition and contents of its Product, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

67.    **WHO:**  Defendant MW Polar Corporation.

---

[44] *Id.*

[45] Millar, *supra* note 40.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

68.   **WHAT:**  Defendant's conduct here was, and continues to be, fraudulent because it had a duty to disclose that its Product contains a color additive but failed to do so on the Product packaging.  The inclusion of color additives in salmon products is known to be material to consumers' purchasing decisions by giving the impression that the Product is comprised of wild caught salmon which consumers prefer.  Defendant knew, or reasonably should have known, that this information is material to reasonable consumers, including Plaintiff and the members of the Classes when they make their purchasing decisions, yet Defendant continued to pervasively and affirmatively warrant and represent that the Product is of a quality and character that it is not.

69.   Indeed, by concealing the presence of artificial color in its Product, and thereby imitating wild salmon, Defendant unfairly and deceptively disassociate the Product from the real defects of farm-raised salmon including the following:

(a)   The potential health risks of eating farmed salmon;

(b)   The vast amount of antibiotics, pesticides, and antiparasitics fed to farm-raised salmon;

(c)   The higher levels of chemicals and other dangerous contaminants found in farm-raised salmon;

(d)   The higher saturated fat content of farm-raised salmon;

(e)   The lower beneficial nutrient and omega-3 fatty acid content in farm-raised salmon;

(f)   The significant source of pollution farm-raised salmon are in the marine environment;

(g)   The threat farm-raised salmon pose to wild salmon runs; and

(h)   The controversy around the health risks associated with the artificial coloring agents.

70.   **WHEN:**  Defendant made material misrepresentations and omissions during the putative class period, including prior to and at the time of Plaintiffs' and

the Members of the Classes purchases, despite Defendant knowing—or reasonably should have known—that the Product contained astaxanthin. Plaintiffs viewed the packaging and advertising of the Product at the time of purchase and viewed the representations and warranties made by Defendant on the packaging and corresponding marketing, understanding them to mean that the Product was of a higher, fresher, naturally caught composition than farm raised.

71.   **WHERE:**  Defendant's marketing messages were uniform and pervasive throughout California, New York, and the United States, carried through material misrepresentations, warranties, and omissions on its labeling, packaging, and marketing materials.

72.   **HOW:**  Defendant made material misrepresentations and omissions of fact regarding the Product by representing and warranting that the Product did not include color additives and therefore was of a higher quality than it is.

73.   **WHY IT IS FALSE:**  Defendant made material representations and warranties that the Product did not include color additives. These representations and warranties communicate to reasonable consumers that the Product is of a "premium quality" comparable to, if not the same as, quality consumers reasonably have come to expect from wild caught salmon. However, and although consumers like Plaintiffs purchased the Product for the purpose of purchasing salmon that was free of synthetic color additives, the Product actually contains astaxanthin..

74.   **INJURY:**  Plaintiffs and the members of the Classes purchased, and paid a premium, or otherwise paid more for the Product they otherwise would not have—had they known that the Product contained color additives and so was of a lessor farm-raised quality than a wild-caught quality fish.

## CLASS ALLEGATIONS

75.   ***Nationwide Class.***  Plaintiffs bring this nationwide class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

18

1
2

> All persons in the United States who purchased the Product during the statute of limitations period.

3    76.    ***California Subclass.***  Plaintiff Beal brings this California Subclass

4    action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and

5    on behalf of the subclass defined as:

6
7

> All persons in the State of California who purchased the Product during the statute of limitations period.

8    77.    ***New York Subclass.***  Plaintiff Whetstone brings this New York

9    Subclass action pursuant to Rule 23 of the Federal Rules of Civil Procedure,

10   individually and on behalf of the subclass defined as:

11
12

> All persons in the State of New York who purchased the Product during the statute of limitations period.

13   78.    Unless otherwise specified, the "Class" shall refer to the Nationwide

14   Class.  The Classes collectively shall be referred to as the "Classes."

15   79.    Excluded from the Classes are: (1) persons who made such purchases

16   for the purpose of resale; (2) any Judge or Magistrate presiding over this action and

17   any members of their families; (3) Defendant, Defendant's subsidiaries, parents,

18   successors, predecessors, and any entity in which Defendant or its parent has a

19   controlling interest and their current or former employees, officers, and directors;

20   and (4) Plaintiffs' counsel and Defendant's counsel.

21   80.    ***Numerosity.***  At this time, Plaintiffs do not know the exact number of

22   members of the aforementioned Class and Subclasses ("Class Members" or

23   "Subclass Members").  However, given the nature of the claims, Plaintiffs believe

24   that Class and Subclass Members are so numerous that joinder of all members is

25   impracticable.

26   81.    There is a well-defined community of interest in the questions of law

27   and facts involved in this case.  Questions of law and fact common to members of

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the Class and Subclasses that predominate over questions that may affect individual Class Members include:

(a)    Whether the Product contained astaxanthin;

(b)    Whether a reasonable consumer would understand Defendant's marketing and packaging to understanding that the Product would be free color additives like astaxanthin;

(c)    Whether Defendant misrepresented and/or failed to disclose material facts concerning the Product;

(d)    Whether Defendant had a duty to disclose the presence of astaxanthin in its Product;

(e)    Whether Defendant's conduct was unlawful;

(f)    Whether the salmon was farm raised or wild caught;

(g)    Whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class and Subclasses;

(h)    Whether Plaintiffs, the Class, and Subclasses sustained damages with respect to common law claims asserted, and if so, the proper measure of those damages.

82.    With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated California Civil Code § 1750, *et seq*., California's Consumers Legal Remedies Act ("CLRA"); California's Unfair Competition Law, California Business & Professions Code § 17200, *et seq.* ("UCL"); and California's False Advertising Law, California Business & Professions Code § 17500, *et seq*. ("FAL").

83.    With respect to the New York Subclass, additional questions of law and fact common to the members include whether Defendants violated New York Gen. Bus. Law § 349 and New York Gen. Bus. Law § 350.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

84. ***Typicality.*** The claims of the named Plaintiffs are typical of the claims of the Classes because the named Plaintiffs, like other members of the Class and Subclasses, purchased the Product relying on the representations and warranties made by Defendants on the Product's packaging that the Products did not include color additives.

85. ***Adequate Representation.*** Plaintiffs are adequate representatives of the Class and Subclasses because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

86. ***Superiority.*** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the members of the Class and Subclasses. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**COUNT I**
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq.***
**(On Behalf of Plaintiffs, the Nationwide Class, and California Subclass)**

87.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

88.     Plaintiffs bring this claim individually and on behalf of themselves, the Nationwide Class, and California Subclass against Defendant.

89.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…"

90.     Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that the goods are of a particular style or model, if they are of another."

91.     Civil Code § 1770(a)(9) prohibits "advertising goods … with the intent not to sell them as advertised."

92.     Defendant violated Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as not containing color additives when it contained astaxanthin, a color additive.

93.     Defendant had exclusive knowledge and/or superior knowledge of the contents of the Product as it was responsible for maintaining its farms and feeding its fish, which was not known to Plaintiffs or the Classes.

94.     Defendant made material misrepresentations about the Product to Plaintiffs and the Members of the Classes while suppressing the true nature of the Product.  Specifically, by warranting that the Product was of a "premium quality," with an image of a bright pink salmon filet akin to natural pink coloring consumers like Plaintiffs associate with wild caught salmon, and failing to disclose that it contained color additives when the Product actually contained astaxanthin, Defendant affirmatively and materially misrepresented the Product as being of a

22

higher quality consumers attach to wild caught salmon when, instead, the Product is farm-raised and colored through synthetic, non-natural alternatives.

95.    Plaintiffs and the Classes have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid.

96.    On April 2, 2025., prior to the filing of this complaint, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all material respects with California Civil Code § 1782(a).  The letter advised Defendant that it was in violation of the CLRA with respect to the presence of astaxanthin in the Product and demanded that Defendant cease and desist from such violations and make full restitution by refunding the monies received therefrom to consumers.  The letter stated that it was sent on behalf of all other similarly situated purchasers.

97.    Defendant failed to remedy the issues raised by the notice letter.

98.    Pursuant to Civ. Code § 1780, Plaintiffs and the Classes seek: (a) actual damages in an amount to be determined at trail; (b) an order enjoining Defendant from continuing its violative acts and practices; (c) restitution of all money and property lost by Plaintiffs and Members of the Classes as a result of Defendant's unlawful conduct; (d) punitive damages; (e) any other relief that the Court deems proper; and (f) attorneys' costs and fees.

## COUNT II
### Violation of California's Unfair Competition Law ("UCL")
### California Civil Code § 17200, *et seq.*
### (On Behalf of Plaintiffs, the Nationwide Class and California Subclass)

99.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

100.    Plaintiffs bring this claim individually and on behalf of the Nationwide and California Subclass against Defendant.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

101.   California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

102.   Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** by misbranding its Product pursuant to 21 U.S.C. § 343, by violating FDA's labeling requirements for salmon under 21 C.F.R. 101. § 101.22(k)(2).

103.   Additionally, Defendant also engaged in unlawful business practices by misbranding its Product under California law, Cal. Health & Safety Code §§ 110740 and 110795, by failing to follow FDA's labeling requirements for salmonid fish.

104.   Finally, Defendant engaged in unlawful business practices by violating CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9); California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*; and New York Gen. Bus. Law §§ 349 and 350.

105.   In addition, as described more fully above, Defendant's misleading marketing, advertising, packaging, and labeling of its Product is likely to deceive reasonable consumers.  In addition, Defendants have committed unlawful business practices by, *inter alia*, making the presentation and omission of material facts, as set forth more fully above, thereby violating the common law.

106.   Defendant also violated the UCL's prohibition against engaging in **Unfair Business Practices.**  Defendant's acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein also constitutes "unfair" business acts and practices within the meaning of Bus. & Prof. Code § 17200, *et seq.*, as the conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

107.  There were reasonably available alternatives to further Defendant's legitimate business interest, other than the conduct described above.

108.  Defendant has further violated the UCL's proscription against engaging in **Fraudulent Business Practices.**  Defendant's claims, nondisclosures, and misleading statements with respect to the Product, are more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

109.  Plaintiffs and the Members of the Classes suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the inclusion of astaxanthin in the Product.

110.  There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

111.  Plaintiffs and the Members of the Classes had no way of reasonably knowing that the Product they purchased was not marketed, advertised, packaged, or labeled in conformity with Defendant's representations.  Thus, they could not have reasonably avoided the injury each of them suffered.

112.  The gravity of the consequences of Defendant's conduct, as described above, outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff Beal and the other Members of the Classes.

113.  Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Classes seek an order of this Court that includes, but is not limited to, requiring Defendant to (a) provide restitution to Plaintiffs and the other Class Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs' attorneys' fees and costs.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## COUNT III
### Violation of California's False Advertising Law ("FAL")
### California Business & Professions Code § 17500, *et seq.*
### (On Behalf of Plaintiffs, the Nationwide Class, and California Subclass)

114.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

115.    Plaintiffs bring this claim individually and on behalf of themselves, the Nationwide Class, and California Subclass against Defendant.

116.    Defendant's acts and practices, as described herein, have deceived and are likely to continue to deceive members of the Nationwide and California Subclass and the public.  As described throughout this complaint, Defendant misrepresented the Product as not containing color additives and representing to reasonable consumers that the Product is of a "premium quality" comparable to, if not the same as, wild-caught salmon quality.  However, the Product is not as it gets its pink coloring from astaxanthin, a synthetic color additive.

117.    By its actions, Defendant disseminated uniform advertising regarding the Product to and across California and the United States.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.*  Such advertisements were intended to and likely did deceive the consuming public.

118.    The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Product contains color additives.

119.    Defendant continues to misrepresent to consumers that the Product is of "premium quality" akin to wild caught salmon and does not contain color additives when, in fact, the Product contains astaxanthin.

120.    In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of

26

California law.  Plaintiffs and the Members of the Classes based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to millions of dollars.  Plaintiffs and the Members of the Classes were injured in fact and lost money and property as a result.

121.   The misrepresentation and non-disclosures by Defendant and the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

122.   As a result of Defendant's wrongful conduct, Plaintiffs and the Members of the Classes lost money in an amount to be proven at trial.  Plaintiffs and the Members of the Classes are therefore entitled to restitution as appropriate for this cause of action.

123.   Plaintiffs and the Classes therefore seek (a) all monetary and non-monetary restitution allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys' fees and costs under California Code Civ. Proc. 1021.5; (d) injunctive relief, and other appropriate equitable relief.

## **COUNT IV**
### **Violation of New York General Business Law § 349**
### **(On Behalf of Plaintiff Whetstone and the New York Subclass)**

124.   Plaintiff Whetstone incorporates the forgoing allegations as if fully set forth herein.

125.   The acts of Defendant, as described above, constitute unlawful, deceptive, and fraudulent business acts and practice.

126.   Defendant markets the Product as being of a "premium quality" akin to quality reasonably expected of wild caught salmon, and not containing color additives, when testing demonstrates that the Product actually contains astaxanthin.

27

127.    Defendant thus has violated, and continues to violate, § 349 of the New York General Business Law ("NYGBL"), which makes deceptive acts and practices unlawful.  As a direct and proximate result of Defendant's violations of § 349, Plaintiff Whetstone and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

128.    Defendant's improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff Whetstone and the New York Subclass members to purchase and pay the requested price for the Product when they otherwise would not have, or would not have, purchased as much.

129.    Defendant made the untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

130.    Plaintiff Whetstone and the New York Subclass members have been injured by their purchase of the Product, which was worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

131.    Defendant's advertising induced Plaintiff Whetstone and the New York Subclass members to buy the Product, to buy more of it, and/or to pay the price requested.

132.    As a direct and proximate result of Defendant's violations of § 349, Plaintiff Whetstone and the other members of the New York Subclass paid for a falsely advertised Product and, as such, have suffered damages in an amount to be determined at trial.

133.    By reason of the foregoing, Plaintiff Whetstone and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 349(h).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## COUNT V
### Violation of New York General Business Law § 350
### (On Behalf of Plaintiff Whetstone and the New York Subclass)

134.   Plaintiff Whetstone hereby incorporates the foregoing allegations as if fully stated herein.

135.   Each of the acts of Defendant, as described above, constitute unlawful, deceptive, and fraudulent business acts and practices.

136.   New York General Business Law § 350 declares unlawful any "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state[.]"

137.   NYGBL § 350-a defines "false advertising" in relevant part, as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

138.   Plaintiff Whetstone and the members of the New York Subclass are consumers who purchased Defendant's Product in New York.

139.   As a seller of goods to the consuming public, Defendant is engaged in the conduct of business, trade, or commerce, within the intended ambit of § 350.

140.   Defendant's representations (made by statement, word, design, device, sound, or any combination thereof), and also the extent to which Defendant's advertising has failed to reveal material facts with respect to its Product, as described above, have constituted false advertising in violation of § 350.

141.   Defendant knew, or reasonably should know, that its advertising of the Product is false.  Defendant is the manufacturer, marketer, and seller of the Product and thereby is privy to the production, marketing, labeling, and production processes that create and put the Product into commerce.  Defendant was in the best position to know of, and test for, the quality and safety of the Product but nonetheless chose to continue its course of marketing regardless.

142.   Defendant's actions led to direct, foreseeable, and proximate injury to Plaintiff Whetstone and the members of the New York Subclass.

143.   As a consequence of Defendant's deceptive marketing scheme, Plaintiff Whetstone and the other members of the New York Subclass suffered an ascertainable loss, insofar as they would not have purchased the Product had the truth been known, would not have paid the requested price of the Product and/or would have purchased less of the Product; moreover, as a result of Defendant's conduct, Plaintiff Whetstone and the other members of the New York Subclass received the Product at a lesser value than what they paid for.

144.   By reason of the foregoing, Plaintiff Whetstone and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 350-e(3).

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

145.   Plaintiffs hereby incorporate the foregoing allegations as if fully set forth herein.

146.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class under the laws of California.

147.   To the extent required by the law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

148.   Plaintiffs and the Nationwide Class conferred benefits on Defendant by purchasing the Product.

149.   Defendant was unjustly enriched in retaining the revenues derived from Plaintiffs and the members of the Nationwide Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendant failed to disclose that the Product contained color additives, rendering its representations that

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the Product is of a "premium quality" false and misleading as consumers like Plaintiffs reasonably understood that the Product was of a wild caught quality instead of the lessor farm raised quality.  These omissions caused injuries to Plaintiffs and the members of the Nationwide Class because they would not have purchased the Product if the facts were known.

150.   Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiffs and the members of the Nationwide Class is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgement against Defendant as follows:

(a) For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Classes, and Plaintiffs' attorneys as Class Counsel;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in the amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper;

(h) For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Dated: May 28, 2025    Respectfully submitted,

          **BURSOR & FISHER, P.A.**

          By: */s/ L. Timothy Fisher*
                L. Timothy Fisher

          L. Timothy Fisher (State Bar No. 191626)
          Joshua R. Wilner (State Bar No. 353949)
          Joshua B. Glatt (State Bar No. 354064)
          Ryan B. Martin (State Bar No. 359876)
          1990 North California Blvd., 9th Floor
          Walnut Creek, CA 94596
          Telephone: (925) 300-4455
          Facsimile:  (925) 407-2700
          E-mail: ltfisher@bursor.com
              jwilner@bursor.com
              jglatt@bursor.com
              rmartin@bursor.com

          *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## <u>CLRA VENUE DECLARATION</u>

I, L. Timothy Fisher, declare as follows:

1.    I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff.  Plaintiff Beal resides in Escondido, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.    The Complaint filed in this action is filed in the proper venue for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Southern District of California, as Plaintiff Beal resides in this District and purchased the Product from a store in this District. Additionally, Defendant advertises, markets, manufacturers, sells, and distributes the Product at issue to Class Members in this District.

3.    I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California this, May 28, 2025.

_____/s/ L. Timothy Fisher_
L. Timothy Fisher

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED